Filed 12/31/25  P. v. Williams CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100503 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE008519) |
| v. | |
| DESHUN LAMONT WILLIAMS, | |
| Defendant and Appellant. | |

In retaliation for a previous fight between gangs, defendant Deshun Lamont Williams and codefendants Ahmaad Rashad Chaney and Michael Johnson participated in a shooting.  A jury found each of them guilty of attempted murder and found Williams guilty of being a felon in possession of a weapon.  The trial court separately found true allegations that Williams had a prior strike conviction and committed the attempted murder for the benefit of a criminal street gang.  On appeal, Williams raises several challenges to his convictions and special circumstance allegations.  The People point out that although the trial court found Williams had suffered the prior strike conviction within Penal Code section 667, subdivision (a), the court failed to address the enhancement

1

when it sentenced Williams. We remand for the trial court to determine whether to impose or strike the enhancement, otherwise we affirm.

## LEGAL AND FACTUAL BACKGROUND

At around 6:20 p.m. on May 26, 2020, B.M.[1] went to an apartment complex to sell marijuana to E.R. As B.M. met E.R. near her car, a white car pulled up and several men got out and began shooting. B.M. was shot seven or eight times, including in the back of his shoulder, his lower right abdomen, and his hand. B.M. later told a police officer that he heard gunshots and saw three or four men with ski masks shooting at him. They were Black males in their twenties.

Another eyewitness told police he saw a white Ford Fusion come "out of nowhere." Three people got out of the car wearing ski masks and holding firearms. He described them as male, dark-skinned, and 15 to 18 years of age. He heard gunshots, then he saw the three men get back into the Fusion and speed away. The driver looked like a woman.

A pizza delivery person was near the complex and provided dash-camera footage to the police. The dash-camera video showed three men exit a white Ford Fusion. The front passenger exited first and wore a black hooded sweatshirt, khaki-colored pants, and white tennis shoes. He concealed something under his sweatshirt. Based on matching clothing and the person's build, this person was later identified as likely to be Johnson. The rear passenger behind the driver's seat wore a black hooded sweatshirt, light jeans, and distinctive Jordan 13 shoes. He was later identified as likely to be Chaney, who was later found wearing the same clothes. A third man exited the rear passenger seat. Beyond the fact that he wore a hooded sweatshirt, police could not identify his clothing from the video.

---

[1]    To protect their privacy, we refer to the victim and certain witnesses by their initials.

Police used a combination of video surveillance recordings and high-speed license plate readers to identify the license plate of the vehicle used in the shooting:  a white Ford Fusion registered to Williams's girlfriend.  Police also learned that Williams was likely driving the Fusion earlier that day.

Police located the Fusion outside the residence of Williams's parents.  In the early morning hours, four people got into the Fusion and drove away.  When police attempted to make a traffic stop, the Fusion turned into an apartment complex.  The car did not actively evade but slowed down; the two backseat passengers fled on foot.  The car then stopped.

When police approached, Williams was in the driver's seat and Chaney was the remaining passenger in the car.  Williams was wearing a white V-neck T-shirt and black pants.  His clothing did not match the clothing of the third suspect in the dash-camera video.  Police seized Williams's cell phone and house keys from his pocket and seized Chaney's cell phone.

Johnson was apprehended and arrested after fleeing from the car.  He was in possession of a Taurus .40-caliber firearm and a Glock-style .40-caliber firearm.  Police were unable to apprehend the fourth suspect who fled the vehicle.

Minutes before and after the shooting, Williams's phone was in the area of a cell phone tower near the apartment complex where the shooting occurred.  A traffic camera also recorded a white Ford Fusion following a BMW (B.M. arrived in a BMW) around the time of the shooting.

The day after the shooting, police searched Williams's apartment.  Police found a backpack with 43 live cartridges of .40-caliber ammunition.  Police also found indicia of Oak Park Bloods gang membership, including photographs of gang members and gang paraphernalia.

At the crime scene, police found 12 expended shell casings, including three .40-caliber casings and nine 9-millimeter casings, and one unspent nine-millimeter casing.  A

3

firearms expert concluded three different firearms produced the casings found at the scene. Three of the .40-caliber casings submitted for analysis had been fired from the Taurus .40-caliber firearm law enforcement found on Johnson. One firearm fired three of the nine-millimeter casings, and a second weapon fired the other six.

Criminalists from the Sacramento County crime lab tested two masks (a camouflage mask and a Joker mask), a Russell sweatshirt, and a Metallica T-shirt recovered from the Fusion. All tested positive for gunshot residue. In addition, a criminalist determined that four people contributed to the DNA found on the Joker mask, including Williams and Chaney. Chaney and Johnson also contributed DNA to the clothing found in the vehicle.

The prosecution introduced gang evidence, which will be discussed in greater detail below. For now, it suffices to say that the evidence showed that in the days before the shooting, there were altercations between the Oak Park Bloods and rivals Del Paso Heights Bloods, G-Mobb, and Meadowview Bloods. Text messages on Williams's cell phone revealed he was upset about one of the altercations.

Detective David Eagleton, an expert on South Sacramento gangs, opined that all three defendants were Oak Park Bloods gang members and that the shooting of B.M. was in retaliation for an altercation the previous night. According to Detective Eagleton, the defendants were looking for a "perceived rival" to shoot and the apartment complex where the shooting occurred was in rival G-Mobb gang territory.

The defense presented evidence from an eyewitness who testified that she saw the shooting from her car and that the driver of the car was a Black female.

R.F. also testified for the defense. He testified that he spent the afternoon with Williams until about 6:30 p.m. (the shooting happened around 6:20 p.m.).

In rebuttal, the prosecution called Detective Marcus Masingale who testified as an expert in the Oak Park Bloods street gang. He opined that R.F. was an Oak Park Bloods gang member because he was in photographs on social media throwing gang signs.

4

The jury found Williams and his codefendants guilty of attempted murder (B.M.) (Pen. Code, §§ 664 & 187, subd, (a); count one)[2] and that the attempted murder was done willfully, and with deliberation and premeditation.  In association with count one, the jury found that codefendants Johnson and Chaney personally and intentionally discharged a firearm causing great bodily injury.  The jury also found Williams guilty of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count two).

After a bifurcated court trial on additional allegations,[3] the trial court ultimately found true the allegation that Williams and his codefendants committed the offense for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1).  The court also found true the allegation that Williams had a prior serious felony conviction within the meaning of section 667, subdivision (a), and that he had a prior serious felony (a strike) within the meaning of sections 667 and 1170.12.

The trial court denied defense motions for a new trial and sentenced Williams to the middle term of two years on count two plus 14 years to life (seven years to life doubled because of the prior strike) on count one.  Williams filed a notice of appeal.

DISCUSSION

I

*Premeditated Murder*

Williams contends that by failing to formally charge him with premeditated attempted murder, the prosecution failed to provide the required notice of the charge, in

---

[2] Undesignated statutory references are to the Penal Code.

[3] A trial on the gang allegation was initially tried to a jury in a bifurcated trial but the jury announced it was deadlocked, and the court declared a mistrial.  Williams subsequently waived his right to a jury trial in the retrial on the gang allegation, with the understanding that if the trial court found the allegation true there would be no additional punishment imposed.  Williams also waived his right to a jury trial on the prior strike allegation.

5

violation of federal and state due process as well as the explicit requirements of section 664, subdivision (a). (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 7; *People v. Mancebo* (2002) 27 Cal.4th 735.) We agree that the allegation was never formally charged, as required by section 664; the People do not contend otherwise. However, the People contend Williams forfeited the issue by failing to object in the trial court and that there was no due process violation because Williams acknowledged he had notice of the allegation since the start of trial. We conclude Williams is not entitled to relief on this claim.

    A. Background

The prosecutor initially charged Williams with "a violation of Section 664/187(a) of the Penal Code of the State of California, in that [Williams] did unlawfully, and with malice aforethought attempt to murder [B.M.], a human being." On the second day of trial, the prosecutor filed an amended information adding several sentencing factors in aggravation. Neither charging document contained separate allegations that the attempted murder was willful, deliberate, and premediated.

After the close of evidence, the trial court instructed the jury pursuant to CALCRIM No. 601 regarding the additional allegation that attempted murder was done willfully and with deliberation and premeditation. The jury found Williams guilty of attempted murder and found true the premeditation allegation.

Several months later, the trial court pronounced judgment and sentencing for Williams, which included a life term.

Williams then stated: "If I can, on record I would like to object due to my due process rights was violated due to—I wasn't given adequate time to prepare a defense for this case, knowing that the day of trial, my time from [*sic*] went from five, seven, nine to a life sentence, *all in the first day of trial*. [¶] I only had my attorney for seven months. He wasn't even given enough time to prepare a defense. [¶] I never even had my full

6

discovery during trial. I only had 300 pages out of 26, [*sic*] 2900 pages. [¶] We weren't given adequate time."

Williams's defense counsel then added: "I would note that on the first day of trial, the People included the allegation of premeditation, which obviously changed the complexion of the case. I believe there was an objection by all counsel at the time of the filing of the amendment on timeliness grounds, and I would just reiterate that objection and concur with Mr. Williams' argument."

The prosecutor did not offer any comment.

B. Analysis

Pursuant to section 664, attempted murder is punishable with a term of five, seven or nine years, unless the fact that the attempted murder was willful, deliberate, and premeditated is alleged in the accusatory pleading and found true by the trier of fact, in which case the defendant is subject to life imprisonment. Subdivision (a) of section 664 further provides: "The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (See generally *People v. Houston* (2012) 54 Cal.4th 1186, 1225-1228 [considering a claim pursuant to § 664, subd. (a)].)

"[I]n addition to the statutory requirements that enhancement provisions be pleaded and proven, a defendant has a cognizable due process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes." (*People v. Mancebo, supra*, 27 Cal.4th at p. 747.) " ' "To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges." ' " (*People v. Aguirre* (2025) 18 Cal.5th 629, 682.)

7

Initially, we reject Williams's contention that the issue involves an unauthorized sentence. The unauthorized sentence doctrine provides relief from forfeiture for "obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings." (*People v. Smith* (2001) 24 Cal.4th 849, 852.) It applies when the court imposes a sentence that "could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) Our California Supreme Court has made clear that "[t]o impose unpleaded sentence enhancements is an error of a different variety." (*People v. Anderson* (2020) 9 Cal.5th 946, 962.) In fact, the court has "effectively rejected the notion that a pleading defect necessarily results in an unauthorized sentence." (*Ibid.*)

We find *Houston* instructive in resolving Williams's claim. In that case, the indictment did not contain an allegation that the attempted murders were deliberate and premeditated. (*People v. Houston, supra*, 54 Cal.4th at p. 1226.) During the defense's presentation of its case, the court noted that the defendant, if convicted, would be sentenced to life imprisonment and asked the parties whether there were issues with the proposed jury instructions and verdict forms. (*Id*. at p. 1227.) One week later, the court stated that the verdict forms would allow the jury to make a special finding as to deliberate and premeditated attempted murder. After the close of evidence, the court instructed the jury as to deliberate and premeditated attempted murder and the jury made the special finding. (*Id*. at pp. 1227-1228.) The defendant did not object before the court submitted the case to the jury or at sentencing. (*Ibid*.)

On these facts, our Supreme Court noted that "[h]ad defendant raised a timely objection to the jury instructions and verdict forms at any of these stages of the trial on the ground that the indictment did not allege that the attempted murders were deliberate and premeditated, the court could have heard arguments on whether to permit the prosecutor to amend the indictment." (*People v. Houston, supra*, 54 Cal.4th at p. 1227.) The court ultimately found the defendant "received adequate notice of the sentence he

8

faced, and the jury made an express finding that the attempted murders were willful, deliberate, and premeditated. . . . Because defendant had notice of the sentence he faced and did not raise an objection in the trial court, he has forfeited this claim on appeal." (*Id*. at p. 1228.)

The same conclusion is warranted in this case. Here, Williams's postsentencing objection indicated he knew from the first day of trial that he was subject to a life sentence. Defense counsel concurred, noting that "on the first day of trial, the People included the allegation of premeditation." Counsel further noted, "there was an objection by all counsel at the time of the filing of the amendment on timeliness grounds." Although there is no additional evidence in the record to corroborate these postsentencing statements, the statements themselves establish that Williams was on notice of the premeditation allegation since the first day of trial.[4] In light of this, we conclude he had adequate notice of the premeditation allegation. Indeed, he had considerably more notice than the defendant in *Houston*.

This case is unlike *People v. Arias* (2010) 182 Cal.App.4th 1009 and *People v. Perez* (2017) 18 Cal.App.5th 598, cited by Williams. In *Arias*, the defendant was not charged with willful, deliberate and premeditated attempted murder, nor did the counts reference section 664, subdivision (a), and the prosecution made no request to amend the information to include these allegations. Although the trial court instructed the jury as to premeditation and deliberation, the jury's attempted murder verdicts only found " 'first

---

[4] To avoid forfeiting the claim of insufficient notice, Williams was required to object to the legal surprise of the additional allegation and request a continuance. (*People v. Toro* (1989) 47 Cal.3d 966, 976, disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.) If we accept defense counsel's postsentencing statement that an oral amendment was previously made and objected to, this may save Williams from forfeiture but subjects him to a presumption that the court's ruling on the objection and/or continuance was correct. (See *People v. Stowell* (2003) 31 Cal.4th 1107, 1114; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

9

degree attempted murder' " as to both victims. At sentencing, the trial court imposed life sentences pursuant to section 664, subdivision (a) for the attempted murder convictions. (*Arias*, at p. 1017.) On appeal, the appellate court struck the section 664 sentence enhancements and remanded the matter for resentencing, concluding that the life sentences were unauthorized and violated due process when they were imposed without prior notice to the defendant. (*Arias*, at pp. 1016, 1020, 1022.)

In *Perez*, like in *Arias* and *Houston*, the prosecution failed to allege premeditated attempted murder. (*People v. Perez, supra*, 18 Cal.App.5th at p. 614.) Like *Houston*, but unlike *Arias*, the *Perez* jury "found that each of the attempted murders was willful, deliberate, and premeditated." (*Id*. at p. 606.) The question before a different panel of this court was "whether the mere mention of the possibility of an enhanced sentence for premeditated attempted murder during the court's discussion of unrelated jury instructions impart[ed] the notice required by due process as described in [*Houston*] or whether . . . the rationale of [*Arias* was appropriate] in holding the sentence was unauthorized in light of the prosecution's failure to satisfy the express statutory requirement coupled with the failure to advise defendant of the potential enhanced penalty." (*Id*. at p. 614.) This court found the latter approach persuasive.

In so concluding, this court found that, "[u]nlike the trial court in *Houston*, which clearly telegraphed the issue for the defendant, the prosecutor's brief allusion to the attempted murder counts when discussing an unrelated jury instruction did not give defendant fair notice that his sentence could jump from a maximum of nine years to a life term for each of the four counts." (*People v. Perez, supra*, 18 Cal.App.5th at p. 618.) To find otherwise would have meant "the prosecution can ignore its responsibility to plead premeditated attempted first degree murder as required by section 664, and a defendant forfeits his or her right to challenge the deficiency as long as the prosecutor at some point during trial mentions or alludes to the two types of attempted murder. Such a rule would

eviscerate section 664, do violence to the meaning and rationale of *Houston*, and undermine any fairminded understanding of notice and due process." (*Id*. at p. 617.)

This case is different. Unlike in *Arias*, Willilams was not subjected to a life sentence after having no notice or special findings by the jury. Unlike in *Perez*, there is no indication that the only notice of the deliberate and premeditated allegations was through a brief reference by the prosecutor during a discussion of unrelated jury instructions. Williams and defense counsel both stated that since the first day of trial they were aware of the deliberate and premeditated allegation which, if found true, subjected Williams to a life sentence. As this provided greater notice than the notice found to be constitutionally adequate in *Houston*, we find no error.

II

*Prior Strike*

Following a bench trial, the trial court found that Williams's prior conviction for violating section 243, subdivision (d) qualified as a strike. Williams disagrees with the trial court's interpretation of the record of his prior plea and contends that his admission to personally inflicting serious bodily injury *or* great bodily injury in connection to violating section 243, subdivision (d) does not establish he admitted the offense qualified as a strike. In the alternative, he contends that the record is ambiguous as to whether he specifically admitted his conviction qualified as a strike. For the following reasons, we disagree with Williams's contentions.

A. Additional Background

The plea proceedings in the prior conviction involved three codefendants including Williams. From the "section 969b packet" that was submitted to the trial court, it is apparent that in 2016, each defendant was charged with violating section 243, subdivision (d) by assaulting the victim, who was not an accomplice, and personally inflicting serious bodily injury within the meaning of section 1192.7, subdivision (c)(8).

11

The prosecution also alleged the codefendants each had a prior strike conviction; Williams did not.

The minute order for Williams's change of plea indicated that in exchange for an agreed-upon middle term of three years, Williams pled no contest to count one, "PC 243(d), a strike, + adm GBI purs PC 12022.7(a)."

During the change of plea hearing, Williams stipulated to the following factual basis: The defendants violated section 243, subdivision (d) by using force or violence against the victim, "resulting in the infliction of serious bodily injury. Specifically, he also personally inflicted great bodily injury on the named victim." The court stated, "Just to clarify the factual basis, you are alleging that all three defendants were involved in this assault and battery and that each one had a role in personally inflicting great bodily injury, just so nobody can claim that, gee, I was only an aider and abettor. They each inflicted sufficient injuries to warrant their admissions here." Williams's counsel agreed. The court also confirmed with Williams personally that he understood he would be sentenced to the "middle term, and he's admitting the GBI just for purposes of personal infliction."

In providing the required plea admonishments pursuant to *Boykin/Tahl*,[5] the court explained each right then "went down the line" of defendants asking each one whether they understood and waived the right in exchange for their negotiated plea. The court followed the same procedure when asking each defendant whether they admitted the allegations and the applicable prior strike. After Williams, who was the second defendant to enter his plea, pled no contest to the charge of violating section 243, subdivision (d), the court asked, "Do you also admit that you personally inflicted serious bodily injury or great bodily injury on that person?" Williams replied, "Yes." Williams then resolved a

---

[5]     *Boykin v. Alabama* (1969) 395 U.S. 238, *In re Tahl* (1969) 1 Cal.3d 122.

12

different pending case and pled no contest to violating section 29800. The court then asked, "And he's not admitting a strike?" Defense counsel stated, "That's correct." The court then accepted Williams's plea and moved on to the third defendant.

In a written ruling on the prior strike allegation, the trial court here found the record of the prior conviction "conclusively establishes Williams stipulated and personally acknowledged the fact that he personally inflicted great bodily injury" upon the victim and that he "pleaded to violating subdivision (d) of section 243 in [the prior case] with the understanding that the conviction would be treated as a strike."

B. Analysis

Under the "Three Strikes" law, a prior conviction for a "strike" offense subjects a defendant to increased punishment. (§§ 667, subd. (b), 1170.12, subd. (a).) The prosecution has the burden to prove both that the offense qualifies as a serious felony in California and that the defendant is the person described in the records of the prior conviction beyond a reasonable doubt. (§ 1025, subds. (b) & (c); *People v. Epps* (2001) 25 Cal.4th 19, 23, 25; *In re Yurko* (1974) 10 Cal.3d 857, 862.) The prosecution may meet this burden by introducing into evidence several types of evidence: certified copies of prison records pursuant to section 969b, certified copies of minute orders, or a certified copy of the abstract of judgment, among other documents. (*People v. Brucker* (1983) 148 Cal.App.3d 230, 241; see also § 969b [certified records of a conviction are admissible for the purpose of establishing prima facie evidence of a prior conviction].)

In determining whether there was sufficient evidence to support a finding that a prior conviction constituted a serious felony and thus a prior strike, we review the record in the light most favorable to the judgment to determine whether it is supported by substantial evidence. (*People v. Miles* (2008) 43 Cal.4th 1074, 1083.)

Both section 667 and section 1170.12 provide that "[any] offense defined . . . in subdivision (c) of [s]ection 1192.7 as a serious felony" qualifies as a prior strike. (§§ 667, subd. (d)(1), 1170.12, subd. (b)(1).) To determine whether a prior conviction

qualifies as a strike under the Three Strikes law, a "court must conduct the inquiry 'with a focus on the elements of the offense of which the defendant was convicted.' " (*People v. Gallardo* (2017) 4 Cal.5th 120, 129.) The court may also rely on facts that "the defendant admitted as the factual basis for a guilty plea." (*Id*. at p. 136.) But the sentencing court cannot make " 'a disputed determination about "what the defendant and state judge must have understood as the factual basis of the prior plea." ' " (*Id*. at pp. 133-134; see also *People v. Wiley* (2025) 17 Cal.5th 1069, 1081 [discussing U.S. Supreme Ct. precedent that allows a sentencing judge to use the prior conviction information for the " ' "limited function" of determining the fact of a prior conviction and the then-existing elements of that offense' "].)

Pertinent to this case, crimes are "serious" when they are felonies and "the defendant personally inflicts great bodily injury on any person, other than an accomplice." (§ 1192.7, subd. (c)(8).) Here, the parties agree that if Williams admitted he personally inflicted great bodily injury in violating section 243, subdivision (d), the conviction would qualify as a prior strike offense. However, they disagree as to whether Williams actually admitted the necessary facts.

Williams states that when he pled to violating section 243, subdivision (d), he admitted he "personally inflicted serious bodily injury *or* great bodily injury" (italics added) on the victim. He contends that because great bodily injury and serious bodily injury are not legally equivalent, this admission with the disjunctive "or" does not establish he pled to a strike offense. It is true that serious bodily injury and great bodily injury "are not equivalent as a matter of law" and are distinct within the context of the definition of serious felonies under section 1192.7, subdivision (c). (*In re Cabrera* (2023) 14 Cal.5th 476, 485, 487.) However, we agree with the People that there is substantial evidence supporting the trial court's finding that Williams's prior conviction qualified as a serious felony offense because the record, as a whole, supports the conclusion that he

admitted that his violation of section 243, subdivision (d) resulted in serious bodily injury *and* that he personally inflicted great bodily injury.

Specifically, when the prosecution charged Williams with violating section 243, subdivision (d) it alleged that Williams personally inflicted serious bodily injury within the meaning of section 1192.7, subdivision (c)(8). The charging document did not contain an enhancement allegation pursuant to section 12022.7, subdivision (a). The minute order regarding the negotiated change in plea indicates Williams pleaded no contest to count one, "PC 243(d), *a strike*, + adm GBI purs PC 12022.7(a)" (italics added), which we interpret to mean he pled to the offense as a strike and admitted he personally inflicted great bodily injury. In the change of plea proceedings, the prosecutor stated that Williams agreed to plead to a violation of section 243, subdivision (d), "as a strike," admit that it caused serious bodily injury on the victim, *and* admit that he personally inflicted "GBI" on the victim. The prosecutor also stated as a factual basis for the plea that Williams willfully and unlawfully used force or violence against the victim resulting in infliction of serious bodily injury and that Williams *also* "personally inflicted great bodily injury on the named victim." Defense counsel for Williams did not object to, or modify, the prosecutor's characterization of the facts and instead stipulated to the factual basis. The trial court then clarified that each of the three defendants "had a role in personally inflicting great bodily injury [on the victim], just so nobody can claim that, gee, I was only an aider and abettor. They each inflicted sufficient injuries to warrant their admissions here." Counsel for Williams agreed on his behalf. Just before Williams pled no contest to battery with serious bodily injury, he conveyed that he understood that he was "admitting the GBI just for purposes of personal infliction." And the 2016 abstract of judgment for the prior conviction showed that Williams was convicted of battery with serious bodily injury and the box indicating "current or prior serious or violent felony" was checked. As the prosecution did not allege Williams had a prior

serious or violent felony, it is reasonable to conclude this referred to his felony conviction for violating section 243, subdivision (d).

While Williams orally admitted the allegation that he personally inflicted "serious bodily injury *or* great bodily injury" (italics added), we disagree that this singular use of the disjunctive "or" on this record renders his admission inadequate to determine Williams's prior conviction qualified as a strike. As just discussed, the remaining entirety of the record amply supports the conclusion that Williams understood and agreed to admit he personally inflicted great bodily injury such that his section 243, subdivision (d) conviction was a serious felony under section 1192.7, subdivision (c)(8). Nor are we troubled by Williams's acknowledgment that he was "admitting the GBI just for purposes of personal infliction." Under the facts of this case, it is reasonable to infer that he admitted personal infliction of great bodily injury to qualify as a serious felony under section 1192.7, subdivision (c)(8) but that the sentence enhancement pursuant to section 12022.7, subdivision (a) was not applicable. Indeed, he made this statement in the context of confirming he understood his negotiated sentence. And the fact that he was not charged with the latter enhancement nor was it a part of his sentence supports this conclusion. And, finally, we conclude it is reasonable to infer that the trial court's question, "And he's not admitting a strike?" merely ensured that Williams, unlike the other two codefendants, did not plan to admit a prior strike conviction.

We conclude there is substantial evidence supporting the trial court's determination that, at the time of his prior plea and conviction for violating section 243, subdivision (d), Williams admitted to a strike offense.

III

*Gang Evidence*

Williams contends the trial court prejudicially erred in admitting several types of gang evidence, because there was no evidence that B.M. was a gang member, much of the evidence was not relevant to link Williams to the instant offense, and the end result

16

was that the court allowed the prosecution to use inadmissible, highly inflammatory propensity evidence to bolster an otherwise weak case. He asserts that this evidence was inadmissible under Evidence Code sections 352 and 1101 and that its introduction violated his constitutional rights to due process. Further, to the extent trial counsel failed to object to several pieces of evidence, counsel provided constitutionally ineffective assistance. The People disagree, arguing the gang evidence explains events leading up to the instant shooting, Williams's gang membership and association with his codefendants, and provides a motive to shoot B.M. as a perceived gang rival. The People further contend that any error was harmless as the nongang evidence was sufficient to establish Williams's guilt. Williams has failed to persuade us that either the court or counsel committed reversible error.

A. Additional Background

Prior to trial, the prosecution sought to admit evidence of gang-related activity under Evidence Code section 1101, subdivision (b), arguing that such evidence was necessary to explain the intent, motive, and premeditation behind the shooting in the instant case as well as witness fear and bias. Specifically, the prosecution sought to introduce: (1) a video posted on social media showing an altercation at the Galleria Mall; (2) a video posted on social media of a fight at Discovery Park; (3) a social media exchange between K.R. (a member of a rival gang) and Williams; (4) photographs showing Williams and his codefendants flashing gang signs; (5) text exchanges that show Williams fought with rival gang members at Discovery Park and was angry about it; (6) gang indicia recovered from Williams's apartment after the shooting; (7) facts relating to a shooting on April 1, 2020, near the area where the instant shooting happened; and (8) gang expert testimony to explain the significance of the above evidence.

Williams also filed a brief with motions in limine. Pursuant to Evidence Code section 352, he moved to exclude evidence of: (1) the April 1, 2020, shooting; (2) the altercation at the Galleria Mall; and (3) the fight at Discovery Park.

17

According to the prosecution, the evidence suggested Williams and his codefendants were members of the Oak Park Bloods gang. On April 1, a gang-related shooting occurred, and a car associated with codefendant Johnson appeared to be involved. Nearly two months later, messages exchanged on social media indicate that Williams fought with rival gang members at Discovery Park and was angry at the outcome, all of which precipitated this shooting. The prosecutor acknowledged that there was no evidence connecting the codefendants to the victim in this case and therefore the gang evidence was highly relevant to explain the theory that B.M. was shot because he was a perceived member of a rival gang in that gang's territory and the shooting happened in retaliation for the fight at Discovery Park. The trial court found the evidence was relevant to connect the codefendants to each other and to show intent, motive, witness bias, or fear. With respect to evidence of a shooting on April 1, the trial court allowed the prosecutor to argue that codefendant Johnson was the driver and not the shooter in that case.

At trial, the following gang evidence was introduced through the testimony of gang expert Detective Eagleton.

At the time of this trial, the largest gang in Sacramento was the Oak Park Bloods. Oak Park Bloods has subsets such as the Fourth Avenue Bloods (FAB) and Underworld Zilla or Ridezilla. Oak Park Bloods also has allies, including Gunz Up. The Oak Park Bloods and their allies call themselves Hellgang.

G-Mobb is a rival gang to the Oak Park Bloods. G-Mobb has subsets such as Starz Up and Gutta Gas. G-Mobb also has allies such as the Meadowview Bloods, Garden Blocc Crips, and the Del Paso Heights Bloods. G-Mobb and its allies call themselves the Gutta Gas Team. G-Mobb's territory borders the territory of the Oak Park Bloods. The instant shooting took place in G-Mobb territory.

Detective Eagleton testified that on April 1, officers pursued, but lost, a car involved in a different shooting. Their investigation led them to Williams as a person

18

who might be connected to the people involved in the shooting. During that investigation, Williams provided the pass code to his phone.

On May 22, 2020, members of the Oak Park Bloods gang chased rival gangs, including Del Paso Heights Bloods and G-Mobb, out of the Roseville Galleria. A video of the incident was posted on social media. The video tagged J.J., a Del Paso Heights member and M.O., who is "kind of a G-Mobb associate" and who associates with Del Paso Heights and, "basically said, Oak Park ran these guys out of the mall." According to Detective Eagleton, "that proceeded into the Discovery Park fight."

On May 25, 2020, the day before B.M. was shot, a large gang fight took place at Discovery Park in Sacramento. Members of Meadowview Bloods, G-Mobb, Del Paso Heights Bloods, and others were having a party. Videos of the fight were posted on Instagram. An Oak Park Bloods gang member was shown on the ground being kicked in the head by several people.

Messages on Williams's phone and codefendant Chaney's phone stated that they were both present for the fight.

A Meadowview Bloods gang member known as Campaign Raider posted a video of the fight on social media and taunted Williams, "had you runnin', leaving your mans." Williams responded, "When I catch you, Ima put you down."

On May 25, Williams texted his girlfriend about the incident: "I just got jumped by some suckas." "I'm busy. I'll hit you after I'm done with my move. They took my earring and broke my chain . . . ." "Just stay at Grandma's for the night until I'm done. . . . I'm hot. They all had me on Instagram, laughing my ass off."

On May 26, almost two hours after the shooting, Williams texted his girlfriend, "Babe, scored. So it's a hot day. You gotta stay at my mom's and grandma's or auntie's."

In Detective Eagleton's opinion, Williams and his codefendants were Oak Park Bloods gang members and that the shooting of B.M. was in retaliation for the Discovery Park fight. Williams and his codefendants were looking for a "perceived rival" to shoot

19

and the apartment complex where the shooting occurred was in the rival G-Mobb gang territory.

The prosecution also presented several photographs; Williams was in most of them and either he or others were making gang signs. Two of those photographs depicted Williams holding a firearm; in one photo he had a firearm in his waistband while displaying the Hellgang hand sign and in another he held an SKS rifle. The photograph of Williams holding the rifle was from Williams's social media.

The jury also heard evidence that codefendant Johnson posted on social media the following caption to a group photo: "Gives 2 Fucks Who Get Hit, Bitch I'm airin out tha crowd." Detective Egleton opined that this statement meant shooting at the crowd and not caring who was hit.

B. Analysis

"With certain exceptions not relevant here, Evidence Code section 1101, subdivision (a), provides that 'evidence of a person's character'—whether in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct—'is inadmissible when offered to prove [the person's] conduct on a specified occasion.' This prohibition, however, does not preclude 'the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than [the person's] disposition to commit such an act,' including 'motive, opportunity, intent, preparation, [or] plan.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 129.)

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) "But 'admission

20

of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged' (*People v. Williams* (1997) 16 Cal.4th 153, 193), and '[t]rial courts should carefully scrutinize' such evidence (*People v. Melendez* (2016) 2 Cal.5th 1, 28, (*Melendez*))." (*People v. Pineda* (2022) 13 Cal.5th 186, 234.) Evidence may be subject to exclusion under Evidence Code section 352 if its probative value is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; see *Chhoun*, at pp. 26, 33.)

"A trial court has wide latitude to admit evidence relevant to motive" (*People v. Johnson* (2019) 32 Cal.App.5th 26, 62), and when the alleged motivation of the crime is gang related, "evidence tending to show" gang membership is "highly relevant." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.) We review a trial court's ruling allowing the presentation of such evidence for an abuse of discretion. (*People v. Pineda, supra*, 13 Cal.5th at p. 234.)

As also relevant here, to show that trial counsel's performance was constitutionally defective for failing to object to gang evidence, Williams must prove: (1) counsel's performance fell below the standard of reasonableness, and (2) but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-685; see *People v. Centeno* (2014) 60 Cal.4th 659, 674-675 [reviewing court assumes defense counsel's performance fell within the wide range of professional competence and counsel's actions and inactions can be explained as a matter of sound trial strategy]; *People v. Ghent* (1987) 43 Cal.3d 739, 772 [mere failure to object to evidence or argument seldom establishes counsel's incompetence]; *People v. Huggins* (2006) 38 Cal.4th 175, 206 [where record fails to show why defense counsel failed to object, the claim of ineffective assistance must be rejected

21

on appeal unless counsel was asked for an explanation and failed to provide one or there can be no satisfactory explanation].)

    1. *April shooting*[6]

Because Williams did not object in the trial court to the admission of the evidence of this shooting, he has forfeited any challenge to its admission. (See Evid. Code, § 353, subd. (a); *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 113 [failure to object to admission of evidence on specific ground forfeits contention on appeal on that ground].) Williams asserts counsel provided ineffective assistance for failing to do so.

Although Williams fails to identify the evidence regarding the April 1 shooting that was introduced at trial, our review of the record indicates only a reference to "another shooting" in April that, through a series of investigative steps, led the police to interact with Williams and to obtain the passcode to his phone. There was no indication that Williams was considered a suspect in the April 1 shooting and any prejudice by the general mention of another shooting was outweighed by its relevancy in explaining how, in relation to the instant case, police later searched Williams's apartment and gained access to Williams's phone by using the same code he previously provided.

In light of this, we conclude Williams has not demonstrated prejudice by counsel's failure to object to the reference of the April shooting. (See *People v. Kipp* (1998) 18 Cal.4th 349, 374 [rejecting a claim of ineffective assistance of counsel when the defendant cannot establish that, but for counsel's performance, there is a reasonable probability the result would have been different].)

---

[6]     This portion of the discussion only addresses the evidence introduced during the jury trial on the substantive offenses. Additional evidence regarding the April 1 shooting was introduced at the bifurcated trial on the gang enhancement.

## 2. Altercation at the mall and park

Williams next contends that evidence of the altercation at the mall was not relevant as "it had no tendency in reason to prove [*his*] motive or intent" because there was no evidence he was involved in the mall altercation. He further contends that although he had a personal dispute with a Meadowview Bloods member as a result of his involvement in the fight at the park, this failed to explain any intent or motive to shoot B.M. who was apparently not involved in the fight at the park or a member of a gang.

It is true that there was no evidence B.M. was a member of any gang. But because Williams and his codefendants had no connection to B.M., the gang evidence was necessary to provide a possible motive for his shooting. Evidence of the altercations at the mall and park showed Williams and his codefendants were associated with the Oak Park Bloods, that there was a buildup of tension between the Oak Park Bloods and members of the rival gang, G-Mobb, and that Williams and Chaney lost a fight with a members of G-Mobb the day before the shooting. Shortly before the shooting of B.M., Williams texted that he was upset about being laughed at for what happened at the park and would get revenge. "I'm busy. I'll hit you after I'm done with my move." "I'm hot. They all had me on Instagram, laughing my ass off."

And B.M. was shot in G-Mobb territory. Based on this, the expert opined that the shooting of B.M. was motivated by retaliation. Although motive is not an element of attempted murder (*People v. Houston, supra*, 54 Cal.4th at p. 1218), it "is often probative of an intent to kill." (*Ibid*.) That was the case here. The gang evidence showed not only why Williams and his codefendants shot B.M., but also made it more likely they shot B.M. with an intent to kill because they were gang members shooting in a rival gang's territory. (See *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1184-1185, 1192 [finding an intent to kill may reasonably be inferred when a gang member fires multiple shots at people in rival gang territory].)

Although Williams argues that this evidence was improperly used to bolster a weak case, "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.] ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' " (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168.) That is the case here.

We find *People v. Hinojos* (2025) 110 Cal.App.5th 524 instructive on this point. In *Hinojos*, "[t]he trial court bifurcated the trial on the substantive murder charge from the gang enhancement and the gang-murder special-circumstance allegations[,] [but] [i]t nonetheless allowed testimony from a gang expert during the substantive phase of trial in furtherance of the People's theory of motive—namely that Hinojos committed the murder to elevate his status from that of a lower-level Hispanic street gang member to a full-fledged Mexican Mafia member." (*Id*. at pp. 549-550.) Hinojos argued, " 'the sheer volume of evidence [introduced in phase one of the trial] far exceeded what was necessary.' " (*Id*. at p. 550.) The *Hinojos* court disagreed, concluding, "the People's gang evidence was relevant to Hinojos's motive for murder and was therefore admissible in the first phase of trial. (See *People v. Valdez*[*, supra*,] 55 Cal.4th [at pp. ]129-131 [evidence of defendant's membership and level of commitment to a gang, allegiance to the Mexican Mafia, and the workings and activities of the gang was admissible as relevant to motive and identity]; [*People v. ]Williams, supra*, 16 Cal.4th at pp. 193-194 [evidence of defendant's leadership role in a gang, rivalry with another gang, and the gang's behavior and areas of influence was admissible as relevant to prove motive].)" (*Id*. at p. 551.)

To the extent there was prejudice, it was limited. The prosecutor here introduced only what was needed to establish Williams and his codefendants were members of the Oak Park Bloods and the events leading up to the shooting. The testimony regarding the

24

incident at the mall was short and only served to explain the fight three days later at the park. The evidence regarding the fight at the park was largely limited to Williams's involvement and subsequent actions.

Williams also fails to point to anything as inflammatory in the gang expert's testimony as the evidence related to the charged acts—shooting at someone multiple times with an intent to kill—that would inflame the jury to be biased against Williams and his codefendants. (See *People v. Camacho* (2022) 14 Cal.5th 77, 121 ["In light of the brutality of the charged crimes, admission of evidence that [the] defendant used offensive language in describing unperformed acts of violence did not create an intolerable risk of prejudice"].) We therefore conclude the trial court did not abuse its discretion in admitting the evidence of the altercations at the mall or park.

### 3. *Photographs of Williams*

Williams claims that two photographs that depict him holding a firearm were improperly admitted because the prosecution failed to establish their relevancy. He specifically contends that that there was no evidence that the firearms depicted were used in the instant shooting—the SKS rifle was incapable of such use—and was cumulative evidence of his gang membership. Accordingly, he contends, the only value the photos had was to prejudice the jury against him by creating the inference that he surrounded himself with weapons.

Although Williams did not object in the trial court to the admission of the photographs, thus forfeiting his challenge (see Evid. Code, § 353, subd. (a); *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 113), we address and ultimately reject the merits of his claim through the lens of his ineffective assistance of counsel claim.

The photographs were relevant to demonstrate Williams's affiliation with the Oak Park Bloods and his codefendants. While they were not the only photos that depicted him making gang signs, they were the only two with firearms. But the record shows that prior to trial the parties were already contemplating a limiting instruction regarding gang

25

evidence and the trial court indicated that such an instruction would be appropriate to address this evidence. Counsel may have made the strategic decision to request a limiting instruction rather than object to the two photos, thus drawing undue attention to them.

Indeed, the trial court ultimately granted the request for a limiting instruction and informed the jury: "You have received evidence relating to gangs and the Defendant's alleged membership and/or affiliation with a gang. Membership and/or affiliation with a gang in and of itself is not unlawful. Accordingly, you may consider this evidence only for the limited purpose of deciding whether the Defendant had a motive to commit the crime charged or harbored the requisite intent to kill. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness or to explain a witness's fear or bias. [¶] You may not consider this evidence for any other purpose."[7]

Because it is possible that defense counsel made the strategic decision to not object for fear of calling extra attention to those two photos, Williams's claim of ineffective assistance of counsel fails. Because the jury is presumed to have understood and followed the court's instruction on this point (see *People v. Yeoman* (2003) 31 Cal.4th 93, 139 [it is presumed that jurors understand and follow instructions]), Williams cannot show that there is a reasonable probability that, but for counsel's failure to object, the outcome of the proceeding would have been different.

*4. Codefendant's statement on social media*

Williams claims that codefendant Johnson's post on social media about "airin out tha crowd" was improperly admitted into evidence for three reasons: (1) it was highly inflammatory propensity evidence that lacked any relevance to Williams's motive or

---

**7** This instruction does not appear in the clerk's transcript as part of the jury instruction packet. However, the parties agreed on the language of the instruction designated as 1403M.

intent in the shooting of B.M.; (2) it should have been excluded as highly inflammatory and cumulative evidence; and (3) it was an artist's creative expression that should have been excluded under Evidence Code section 352.2, which governs the admissibility of "creative expression" and became effective January 1, 2023.

Again, Williams failed to object to this particular evidence at trial, thus, the issue of its admissibility is not preserved for appellate review. (Evid. Code, § 353, subd. (a); *People v. Kipp, supra*, 18 Cal.4th at p. 374.) Perhaps anticipating this conclusion, Williams contends that defense counsel rendered ineffective assistance by not objecting to this evidence.

Taking these points in reverse order, we note that the California Supreme Court recently concluded that Evidence Code section 352.2 applies only prospectively. (*People v. Aguirre, supra*, 18 Cal.5th at p. 693.) As the effective date of the statute was after the jury rendered its verdicts in this case, the statute is not applicable here.

As to the merits of Williams's contention that his counsel should have objected to the introduction of the statement, he fails to point to any evidence in the record that would demonstrate that Johnson's message was a rap lyric by the artist Yatta, as he now claims, or that counsel was aware of this fact and would have known to object on the basis that the quote could not be attributed to Johnson. As such, this claim appears to be based on evidence outside of the record and may be more appropriately raised in habeas corpus proceedings. (See *People v. Hinds* (2003) 108 Cal.App.4th 897, 901, quoting *People v. Fosselman* (1983) 33 Cal.3d 572, 581-582 ["Unless the record affirmatively discloses that counsel had no tactical purpose for his act or omission, 'the conviction will be affirmed and the defendant relegated to habeas corpus proceedings at which evidence dehors the record may be taken to determine the basis, if any, for counsel's conduct or omission' "].)

We also reject the claim that counsel was ineffective for failing to object to the social media post as highly inflammatory propensity or cumulative gang membership

evidence. The evidence strongly supports the conclusion that Johnson and Chaney were two of the shooters. Indeed, a different panel of this court recently concluded there "was ample evidence Johnson shot at B.M. with the intent to kill" and that there was "ample evidence establishing Chaney was one of the shooters." (*People v. Johnson* (Aug. 27, 2025, C100050) [nonpub. opn.].) Because the quote was attributed, accurately or not, to Johnson, Williams's counsel could have strategically refrained from objecting to the introduction of this post. This would have been entirely consistent with Williams's alibi defense and his attempt to focus the jury on the fact that some witnesses described the driver as female. Accordingly, Williams has not shown that counsel's representation was constitutionally ineffective.

IV

*Gang Enhancement*

A. Relevant Law

"Assembly Bill 333 amended Penal Code section 186.22 by imposing new substantive requirements relating to gang enhancements and the criminal offense of gang participation." (*People v. Burgos* (2024) 16 Cal.5th 1, 7.) Most relevant here, it "narrowed the definition of a 'pattern of criminal [gang] activity' . . . . [Citation.] . . . Assembly Bill 333 [also] narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.)

The gang enhancement involved in this case requires the existence of a "criminal street gang." (§ 186.22, subds. (b)(1).) "The definition of a 'criminal street gang' requires that gang members have engaged in 'a pattern of criminal gang activity' (§ 186.22, subd. (f)), with this pattern involving the commission of what are commonly known as predicate criminal offenses." (*People v. Aguirre, supra*, 18 Cal.5th at pp. 713-714.)

A " 'criminal street gang' " is further defined as (1) "an ongoing, organized association or group of three or more persons, whether formal or informal," (2) "having as one of its primary activities the commission of one or more of the [enumerated] criminal acts," (3) "having a common name or common identifying sign or symbol," and (4) "whose members collectively engage in, or have engaged in, a pattern of criminal gang activity."  (§ 186.22, subd. (f).)

A " 'pattern of criminal gang activity' " means (1) "the commission of . . . or conviction of, two or more" enumerated criminal acts, (2) "provided at least one of these offenses occurred after [September 26, 1988], and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed," (3) "the offenses were committed on separate occasions or by two or more members," (4) "the offenses commonly benefited a criminal street gang," and (5) "the common benefit from the offenses is more than reputational." (§ 186.22, subd. (e)(1).)  The enumerated criminal acts that can make up a pattern of criminal activity include unlawful homicide.  (§ 186.22, subd. (e)(1)(C).)  "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential[,] current or previous witness or informant." (§ 186.22, subd. (g).)

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Renteria* (2022) 13 Cal.5th 951, 970.)

B. Predicate Offenses and Additional Gang Evidence

Williams waived his right to a jury trial on the retrial of the gang allegation associated with count one with the understanding that, if the trial court found the allegation true, there would be no additional punishment imposed for the enhancement.

1. *May 2016 shooting*

Retired Detective Bryan Alonso investigated a shooting in May 2016 in Sacramento and testified to the details of his investigation. Z.C. and other students were hanging out in a park when they saw a person in a Lexus drive by a school as he played loud music and made a Hellgang hand sign. Later that day, the driver of the Lexus drove by in the opposite direction with loud music, and the driver said something about "Treyz" and made the Hellgang sign again. "Treyz" refers to 33rd Street in Oak Park.

A little later, someone got out of the passenger's side of the Lexus and shot Z.C. in the leg and abdominal area. Detective Alonso later determined that the driver of the vehicle was Calvin Barron, Jr., and the shooter was Ladarius Murphy. Barron claimed that he was from the Oak Park Bloods and "Treyz." Murphy was a member of the Oak Park Bloods. Detective Alonso also discovered a post on Murphy's social media accounts in which Murphy stated for someone to tell "Tim" that Murphy needed five bands because he tried to shoot a "Star" gang member who did not die.

2. *August 2017 shooting*

Detective Larry Trimpey investigated a shooting in August 2017 at Meadowview Park in Sacramento. A rapper called "C-Bo" posted a video on social media, asking people to come to the park to tape a music video. Thirty to 40 people came to the park, including a person called "Lavish D" and E.C. Two males in a passing Jeep Cherokee fired shots into the crowd, injuring five people and killing E.C. According to Detective Trimpey, police determined that 10 to 15 people in the crowd were affiliated with a gang, "mostly members of Starz or Meadowview Bloods." Three of the five people who were shot were gang affiliated. Detective Trimpey testified that C-Bo was affiliated with the

Garden Blocc Crip gang and Lavish D was affiliated with the Starz gang. Three people affiliated with the Oak Park Bloods gang (Quieson Murphy, Antwan Lands, and Amontie Wortham) subsequently pled guilty to E.C.'s murder. Prior to the shooting, there were threats back and forth between "Mozzy" (Timothy Patterson, an Oak Park Bloods member) and C-Bo.

    3. *Gang expert testimony*

Sacramento Police Detective Marcus Masingale testified as an expert on the Oak Park Bloods. He explained there are subsets of Oak Park Bloods such as the Fourth Avenue Bloods, also known as FAB, and Treyz, also known as 33rd Street. The subsets of the Oak Park Bloods will work together to commit crime. "Hellgang is a little bit different." It is a term that shows an affiliation to that gang and could be used by gangs from Sacramento, Stockton, the Bay area, or even Los Angeles. The Hellgang hand sign is one sign associated with the Oak Park Bloods; "If you have an affiliation with the Oak Park Bloods, you'll use the term Hellgang."

Based on Detective Masingale's experience, the primary activities of the Oak Park Bloods are murder or attempted murder, unlawful possession of a firearm, vehicle theft or carjacking, assault with a deadly weapon, and drug sales. The enemies of the Oak Park Bloods are the Del Paso Heights Bloods from the north area of Sacramento, the Meadowview Bloods from the west, and Starz and G-Mobb from the south.

Detective Masingale was familiar with the shooting of E.C. in August 2017, and he personally participated in the wiretap portion of the investigation in that case. At the time of this trial, Lavish D was the leader of the Starz criminal street gang. Detective Masingale also opined, based on his review of the case and social media, that Murphy and Lands were members of the Oak Park Bloods. Wortham was a member of the Strawberry Manor Gangster Bloods, "one of the closest allies to the Oak Park Bloods."

Detective Masingale opined that the shooting at Meadowview Park in August 2017 was gang motivated because it was a direct retaliation and a show of force by the

31

Oak Park Bloods.  There was a feud between the Oak Park Bloods, specifically Patterson (Mozzy), who is the leader of that gang, and C-Bo, a rival gang member.  Detective Masingale testified that from the facts of the case, he believed Mozzy directed the defendants to commit the shooting.

Further, Meadowview Park is in Meadowview Bloods territory.  Shooting at a gang rival in their own territory benefits the gang doing the shooting in numerous ways including establishing loyalty to and power of the gang.

Detective Masingale was also aware of the shooting of Z.C. in May 2016.  He reviewed arrest reports, social media, and surveillance video, and he spoke with police officers more directly involved in investigation.  Detective Masingale opined that both Calvin Barron, Jr., and Ladarius Murphy were Oak Park Bloods members.  When asked if he had an opinion about whether Barron was a member of a subset, Masingale said, "from what I recall from reviewing that investigation, that he was from 33rd Street.  So Treyz."  Detective Masingale further opined that when Murphy posted on social media that he needed "five bands" from Tim, he was conveying that he had shot a rival gang member and wanted Mozzy to pay him $5,000.

As for the 2016 predicate offense, Detective Masingale opined that the shooting of Z.C. benefited the gang doing the shooting because the act was an attempt to shoot a perceived gang rival, which could benefit the Oak Park Bloods by eliminating someone who could possibly come back and shoot a member of the Oak Park Bloods.

As for the shooting in the instant case, Detective Masingale opined that it was a direct retaliation for the Discovery Park fight and that Williams and his codefendants were all Oak Park Bloods members.  Because the Oak Park Bloods were disrespected on social media after the fight, they had to retaliate or else they would be seen as weak and disloyal to their gang.  Hypothetically, the shooting would also benefit the gang because it eliminated a perceived threat and helped them recruit new members.

32

The trial court found true the gang allegation pertaining to Williams's conviction associated with count one. The trial court was "convinced beyond a reasonable doubt that the Oak Park Bloods are a criminal street gang." Specifically, the trial court found "[a] pattern of criminal gang activity was demonstrated for the Oak Park Bloods by two predicate offenses."

C. Analysis

Williams contends that there was insufficient evidence of "collective engagement in a pattern of gang activity" as required by section 186.22. Specifically, he contends the prosecution failed to establish how the gang members who committed the predicate acts worked together with the larger gang, or that the shooting benefited the gang other than by reputational evidence.

Williams offers several reasons for this argument. First, Williams asserts there was insufficient evidence that the predicate offenses were committed by the same gang as the instant offense. Not so. The investigating officers for each predicate offense testified that the perpetrators in those cases belonged to the Oak Park Bloods. Detective Alonso said that the two people involved in the 2016 shooting were members of the Oak Park Bloods. Although one of the perpetrators was also from Treyz, Detective Masingale testified that Treyz is a subset of the Oak Park Bloods and will work with the Oak Park Bloods to commit crimes. As for the 2017 shooting, investigating officer Detective Trimpey testified the three perpetrators in that offense were affiliated with the Oak Park Bloods. Detectives Eagleton and Masingale opined that Williams and his codefendants displayed sufficient indicia of gang membership on social media platforms such that Detective Masingale opined all three were members of the Oak Park Bloods. Thus, the evidence establishes that all but one of the perpetrators (in the predicate and instant offenses) were members of the Oak Park Bloods and the other perpetrator was a member of a subset of the Oak Park Bloods that worked with the Oak Park Bloods to commit crimes.

The evidence also establishes a connection, or nexus, between the offenses committed by gang members and the organization as a whole, as well as the gang's primary activities of attempted murder and murder. (*People v. Clark* (2024) 15 Cal.5th 743, 762.) The predicate offenses were specifically linked to Oak Park Bloods leader Patterson (Mozzy); at least one perpetrator of the 2016 shooting expected to get paid by Mozzy for shooting a perceived rival; and the 2017 shooting attacked members of rival gangs with whom Mozzy was feuding. The instant offense also involved shooting at a perceived rival after a feud with a rival of the Oak Park Bloods gang. This is sufficient evidence of "a more general, well-understood expectation that members must engage in certain types of offenses." (*Clark*, at p. 762.) In addition, not only did Detective Masingale testify that subsets of the Oak Park Bloods work with the Oak Park Bloods to commit crimes, the 2016 shooting was proof of that collaboration because a member of Treyz worked together with a member of Oak Park Bloods to shoot at a perceived gang rival and called Mozzy's attention to it on social media.

Contrary to Williams's assertions, the fact that the Hellgang is not identified as a subset of the Oak Park Bloods does not mean a gang member committing one of the relevant offenses here while flashing the Hellgang sign cannot be deemed to be affiliated with Oak Park Bloods for purposes of the gang enhancement. Indeed, Detective Masingale testified that "[i]f you have an affiliation with the Oak Park Bloods, you'll use the term Hellgang." And there is no evidence to suggest that you cannot be a member of Oak Park Bloods and use the Hellgang sign or term; rather, the opposite is true.

We also disagree with Williams's contention that error occurred when Detective Masingale improperly relied on reputational evidence to form an opinion as to whether the instant offense was committed for the benefit of the gang. Even if Detective Masingale provided reasons for his opinion that could be deemed reputational, the evidence unequivocally showed that each shooting (the instant and predicate offenses)

34

consisted of targeting a perceived or actual gang rival—which is a statutorily recognized example of a common benefit that is more than reputational. (See § 186.22, subd. (g).)

Finally, we disagree that Williams has shown counsel was ineffective for failing to object to Detective Masingale's use of case specific hearsay when he testified that he recalled "from reviewing that investigation" that a perpetrator of the 2016 shooting belonged to Treyz. Specifically, Williams cannot show he was prejudiced from counsel's failure to object in light of the fact that the investigating officer, Detective Alonso, also testified that a perpetrator of the 2016 shooting belonged to Treyz. In light of this, any objection to Detective Masingale's testimony would have been pointless.

Contrary to Williams's assertions, there was substantial evidence that Williams committed a primary activity (attempted murder) of the gang with his codefendants by targeting a perceived rival in retaliation for the fight the night before.

V

*Unanimity Instruction*

Williams contends the trial court erred in failing to sua sponte give a unanimity instruction relating to his alleged possession of a firearm by a felon where the "prosecution presented evidence of two distinct acts fragmented as to time and space." The People disagree and contend that a unanimity instruction was not required because the prosecution made an election as to the act that constituted the offense during his closing argument.

The jury verdict in a criminal case must be unanimous. This means that "the jury must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Consequently, "[a]s a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it

35

must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

Here, the jury heard evidence tending to show the commission of more than one act that could support the offense of being a felon in possession of a firearm, i.e., once during the shooting and once when stopped by police several hours later. This, however, does not necessarily mean a unanimity instruction was required. "[T]he presentation of evidence showing the commission of more than one act supporting a charged offense creates the requirement of either a unanimity instruction or the ' "prosecution must elect the specific act relied upon to prove the charge to the jury." ' " (*People v. Wilson* (2020) 56 Cal.App.5th 128, 162, italics omitted.) "The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'— typically in opening statement and/or closing argument. [Citations.] Such an election removes the need for a unanimity instruction. [Citation.] [¶] Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it." (*People v. Brown* (2017) 11 Cal.App.5th 332, 341.) Under these circumstances, the evidence still comes solely from the witnesses and the prosecutor is merely doing his or her job—urging the jurors to apply the law to the facts in a specific way so as to come to a specific verdict. (*Ibid.*)

In this case, the prosecution made such an election in closing argument by tying the specific allegation that Williams was a felon in possession of a firearm to the vehicle stop by the police. In closing argument, the prosecutor argued:

"Mr. Williams is also charged separately from the other two defendants with being a felon in possession of a firearm. . . . [¶] So did he possess a firearm? [¶] Two or more people can possess a firearm at the same time. I would argue to you that everybody in that vehicle, when they—when—and we'll watch the in-car camera footage here shortly. Everybody in that vehicle knew they were about to get pulled over by the police. [¶] As they are driving down the street, you have multiple patrol cars flipping U-turns and

getting behind them. I think there were six or seven patrol cars that you could see at some point following that Fusion. These guys knew they were in trouble, right? Everybody knew there were guns in the car. Mr. Williams most of all knew there was weapons in that particular vehicle. That's why the driving pattern is as it was, right? He's not running, but he's not stopping either, right? [¶] When Officer Bradley, the K-9 officer turns on his lights and sirens, Mr. Williams continues to drive, and I will ask you, when we look at that ICC—and we'll go over it again—you will that see the place where those lights are first turned on, there's fields. It's an open kind of area. Not a good place to try to run away if you're planning on somebody from—foot bailing essentially from that vehicle, all right? He waits until he gets into a more—a place with more buildings and bushes and cars and things to flee around or hide from before he pulls over and allows Mr. Johnson and this unknown fourth person to escape. [¶] He knew there was guns in that car, and he had the right to control those. If he had said hey pass me one of those guns, there's no doubt that one of those guns would have been passed to him."

Contrary to Williams's contention, these statements specifically tie the firearm possession charge to the point in time where Williams and his cohorts were stopped by the police after the shooting. (See *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539 [to effectively elect a particular unlawful act in closing argument, the prosecutor's statement tying the act to the charge "must be made with as much clarity and directness as would a judge in giving instruction"].) Thus, a unanimity instruction was not required.

VI

*Cumulative Error*

Williams further contends that the cumulative effect of the alleged errors deprived him of his federal due process right to a fair trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th

37

587, 646.)  "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' "  (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We have found no errors impacting Williams's right to a fair trial so there is nothing to accumulate.

## VII

### *Sentencing*

The trial court found Williams's prior conviction constituted a prior strike offense, but the trial court did not address the five-year enhancement associated with it.  Indeed, the record contains no discussion at the sentencing hearing regarding the section 667, subdivision (a) enhancement.  On appeal, the People request we remand the cause for imposition of this enhancement.  The People concede that a sentencing court may strike or dismiss a serious felony enhancement or strike the additional punishment in the furtherance of justice but allege that because the record is silent on whether the enhancement was struck, dismissed, or imposed, the matter should be remanded.

"Prior to 2019, trial courts had no authority to strike a serious felony prior that is used to impose a five-year enhancement under section 667, subdivision (a)(1).  Senate Bill 1393 removed this prohibition.  (Stats. 2018, ch. 1013, §§ 1, 2.)  The legislation became effective January 1, 2019.  (Cal. Const., art. IV, § 8, subd. (c).)"  (*People v. Jones* (2019) 32 Cal.App.5th 267, 272.)

However, section 1385 authorizes a trial court to dismiss a prior action in furtherance of justice where the Legislature has not clearly evidenced a contrary intent, and that power includes the ability to dismiss or strike an enhancement.  (See *People v. Luckett* (1996) 48 Cal.App.4th 1214, 1216-1217.)  Additionally, section 1385, subdivision (b)(1) provides that if a court "has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice."  (§ 1385, subd. (b)(1); cf. *People v. Stamps* (2020) 9 Cal.5th 685, 700 [Sen. Bill No. 1393 (2017-2018 Reg. Sess.) removed

provisions that prohibited a trial court from striking a serious felony enhancement in furtherance of justice under § 1385].)

We thus agree the trial court had the authority to strike the 667, subdivision (a) enhancement. Yet there is no clear indication by the trial court as to whether it intended to exercise its discretion to strike this enhancement or simply forgot to address it. Nor can we determine that the record, given the sentencing decisions made by the trial court, shows whether the trial court would have stricken or imposed the enhancement. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 ["the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion' "].) Indeed, the trial court sentenced Williams under the Three Strikes law as to the attempted murder charge but did not double the sentence imposed on Williams's conviction for being a felon in possession of a firearm. The trial court's indication toward sentencing leniency on one conviction but not on the more serious conviction, in light of an otherwise silent record, does not allow us to determine the court's intention as to the section 667, subdivision (a) enhancement.

Accordingly, we remand the matter for the limited purpose of allowing the trial court to consider whether to impose or strike the section 667, subdivision (a) enhancement. While we express no opinion on the outcome of that determination, we note that if the court strikes the section 667, subdivision (a) enhancement, Williams's sentence remains unchanged. If the court imposes a sentence on the enhancement, Williams will be entitled to a new sentencing hearing based on the changed circumstances. (Cf. *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].) Although we are not reversing any of Williams's convictions or ruling that a portion of his sentence is invalid, we view imposition of the

sentence on the enhancement as creating sufficiently "changed circumstances" to warrant resentencing.  (See *People v. Jones* (2022) 79 Cal.App.5th 37, 46 [concluding that the need to apply amended law creates changed circumstances sufficient to warrant resentencing].)

## DISPOSITION

The matter is remanded for the trial court's pronouncement as to whether to impose or strike the section 667, subdivision (a) enhancement and any further proceedings consistent with this opinion.  The judgment is otherwise affirmed.


_____/s/_____
EARL, P. J.


We concur:


_____/s/_____
KRAUSE, J.


_____/s/_____
WISEMAN, J.*

---

*        Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.